Robert W. **FLINT**, Jr.

v.

James **MULLEN**, Warden Adult Correctional Institutions.

Civ. A. No. 5251.

United States District Court,
D. Rhode Island.

Dec. 26, 1973.

Addendum to Opinion Jan. 3, 1974.

Ralph J. Gonnella, Providence, R. I., for plaintiff.

Donald P. Ryan, Asst. Atty. Gen., of R. I., Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

Petitioner is presently incarcerated by the State of Rhode Island in the Adult Correctional Institutions and seeks a writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 requesting that the sentence imposed upon him by the Superior Court of Rhode Island on February 26, 1970 at the conclusion of a deferred sentence violation hearing be vacated. Essentially, petitioner raises two legal is-

sues. First, he alleges that the holding of the deferred sentence violation hearing based upon conduct also supporting a new indictment prior to the criminal trial on the new indictment, forced petitioner to make an unconstitutional choice between waiving his Fifth Amendment privilege against self-incrimination and the right to remain silent against his due process right to a full and fair deferred sentence violation hearing. As part of his challenge to the above procedure, petitioner also alleges that holding the violation hearing prior to the criminal trial based upon the same conduct places him in an unequal position at trial as against other criminals because the deferred sentence violation hearing provides the prosecutor with an opportunity for discovery beyond that normally permitted. Second, petitioner alleges that the sentence is unconstitutional because the standard of proof employed to determine violations falls short of due process requirements.

## FACTS

In 1964, petitioner pleaded guilty to three counts of robbery. On two of these counts he was sentenced to prison, but on the third, petitioner entered into a deferred sentence arrangement as authorized by Rhode Island General Laws 1956, § 12–19–19, whereby petitioner was to be placed on probation for five years from the date of his release from prison on the first two counts. As a result, his period of probation began to run when he was paroled in October 1967. In 1969, petitioner was arrested and indicted for the robbery of the Old Stone Bank to which he pleaded not guilty.

Subsequent to the indictment, but prior to the criminal trial for the robbery, the State moved for the Superior Court to declare petitioner in violation of the deferred sentence agreement and a hearing date was set for December, 1969. Petitioner immediately filed writs of prohibition and mandamus in the Rhode Island Supreme Court in an attempt to postpone the violation hearing until after he was tried on the new indictment alleging, *inter alia,* that the violation hearing would compel him to incriminate himself and reveal his defense prior to the trial. Petitioner's objections were rejected respectively by the Rhode Island Supreme Court in Flint v. State, 106 R.I. 823 (1969), the United States District Court, and the United States Court of Appeals for the First Circuit, Flint v. Rhode Island, No. 361 (January 8, 1970).

The violation hearing began on January 14, 1970 and on that date court appointed counsel for petitioner stated that there were facts favorable to the defense that should be presented and that it was his opinion that the defendant should take the stand and testify. During this portion of the hearing, petitioner informed the court that he and his counsel were at odds and on January 20, 1970 counsel was permitted to withdraw and new counsel was appointed causing a continuance of the hearing until February 25. Prior to the appointment of new counsel the State presented five witnesses. Petitioner cross-examined each witness while his counsel limited his cross-examination to the three police officers. All five witnesses originally called by the State were recalled when the hearing resumed on February 25 and petitioner's newly appointed counsel cross-examined each of them. However, despite the strong case presented by the State, petitioner's counsel informed the court at the close of the presentation of the State's evidence that petitioner chose to present no evidence and to not take the stand because he felt that by taking the stand at that time with the new indictment pending, he would be forced to incriminate himself in regard to the subsequent trial and would reveal the defense he planned for the upcoming trial. Relying on the uncontradicted testimony presented by the State, the Superior Court then found the petitioner in violation of his deferred sentence agreement and sentenced him to twelve years. Nine months later, petitioner was tried and acquitted on the robbery

charge which constituted the basis of his deferred sentence violation.

## EXHAUSTION OF STATE REMEDIES

Petitioner has presented his first contention to the Supreme Court of Rhode Island in Flint v. Howard, 291 A.2d 625 (R.I.1972), thus exhausting his state court remedies pursuant to 28 U.S.C. § 2254. However, the State contends that petitioner did not challenge the standard of proof employed in the violation hearing in Flint v. Howard, *supra*. The record does not support this contention. The Supreme Court of Rhode Island addressed directly the issue what is the standard or proof necessary to find petitioner in violation of the deferred sentence agreement, writing at p. 631–632:

"He makes much of this fact, arguing inferentially that if he had been tried on the indictment first, his acquittal would be an effective bar to finding him in violation of his deferred sentence agreement.

That such would be the case, however, is simply not supported by any case cited by petitioner, nor discovered by our considerable independent research. And this is not because the question has remained at large.

*    *    *    *    *    *

Again in Charest v. Howard, R.I., 285 A.2d 381 (1972) and Broccoli v. Kindelan, 80 R.I. 436, 98 A.2d 67 (1952), we held that whereas a jury must be convinced beyond a reasonable doubt in order to convict, the decision of a revoking justice is reversible only if such decision is arbitrary or capricious."

## DISCUSSION

■ Two essential factors must be found before petitioner's application for a writ of habeas corpus can be granted. First, petitioner must have been forced to make an unconstitutional choice at his deferred sentence violation hearing which resulted in the surrender of one constitutional right in order to assert another constitutional right similar to the situation in Simmons et al. v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968) and distinguishable from the situation in McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). Second, although closely intertwined with the first, constitutional due process must be found to apply to a deferred sentence violation hearing. to the extent that petitioner's right to testify personally and present evidence in his behalf take on constitutional dimensions.

The issue before the Supreme Court in Simmons v. United States, *supra*, was whether testimony given by a defendant in a hearing based upon his motion to suppress evidence allegedly obtained in violation of his Fourth Amendment rights should be admissible against him at trial on the issue of guilt. Concluding that this testimony is not admissible at the subsequent trial, the court at p. 393–394 of 390 U.S. at p. 976 of 88 S.Ct. stated:

"For a defendant who wishes to establish standing must do so at the risk that the words which he utters may later be used to incriminate him. Those courts which have allowed the admission of testimony given to establish standing have reasoned that there is no violation of the Fifth Amendment's Self-Incrimination Clause because the testimony was voluntary. As an abstract matter, this may well be true. A defendant is 'compelled' to testify in support of a motion to suppress only in the sense that if he refrains from testifying he will have to forego a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit. However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit. When this assumption is applied to a situation in which the 'benefit' to be gained is that afforded by another provision of the Bill of Rights, an un-

deniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another."

Thus, the Supreme Court in *Simmons* concluded that where the Constitution requires that a defendant be given a specific right or protection, the State may not put the defendant in a position whereby that constitutional right may be exercised only at the price of giving up another constitutional right. To do this places a party in a untenable position not wholly unlike a coerced statement.

Furthermore, the First Circuit in Palmigiano v. Baxter, 487 F.2d 1280 (1973) recently held that limitations upon due process rights may not be upheld simply by a finding that the limitations are rationally related to a legitimate state goal. In *Palmigiano*, a case involving some similar questions, but in the context of a prison disciplinary hearing, the court found that once the right asserted takes on due process dimensions, the State may not abrogate the right if the right presents only a minimal burden upon the State and does not drastically detract from the intended State purpose. By analogy, the court at p. 1287 noted:

"The government's obligation here is fundamentally the same as that underlying its obligation to use 'less drastic means' when infringing upon First Amendment rights, see United States v. Robel, 389 U.S. 258, 267, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), or its obligation to use the 'least restrictive alternative' when impinging up travel, free flow of commerce, or property rights, see Aptheker v. Secretary of State, 378 U.S. 500, 507, 84 S.Ct. 1659,

12 L.Ed.2d 992 (1964); Polar Ice Cream and Creamery Co. v. Andrews, 375 U.S. 361, 375 n. 9, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964); Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951); see also Griswold v. Connecticut, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). When the government has 'reasonable and adequate alternatives available' to a given end, it must choose the measure which least interferes with individual liberties. Dean Milk Co. v. City of Madison, *supra*, 340 U.S. at 354, 71 S.Ct. 295."

The same concept has been propounded by the Supreme Court in United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1960). Declaring unconstitutional a statute because the court found that the statute, which provided for the death penalty after a verdict by a jury but not after a verdict by a judge, discouraged one's exercise of his Sixth Amendment right to a jury trial, the court held that legislative objectives "cannot be pursued by means that *needlessly* chill the exercise of basic constitutional rights." 390 U.S. at 582, 88 S.Ct. at 1216. (emphasis added)

Confronted with petitioner's two-pronged allegation in *Palmigiano, supra,* that failure to assure him that his testimony at the prison disciplinary hearing could not be used against him in a subsequent criminal action based upon the same conduct and that he would not be penalized for his failure to testify at the disciplinary hearing involved a violation of his Fifth Amendment rights, the court concluded at p. 1289 of 487 F.2d:

"Where the possibility exists of the inmate being penalized for the same criminal conduct in a disciplinary hearing and a criminal trial, he should be entitled to 'use' immunity for statements he might make within the prison disciplinary hearing. See Sands v. Wainwright, supra [D.C.], 357 F. Supp. [1062] at 1093; Carter v. McGinnis, supra, [D.C.], 351 F.Supp. [787] at 793; cf. Melson v. Sard, 131

U.S.App.D.C. 102, 402 F.2d 653, 655 (1968); Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed. 2d 212 (1972). The provision of use immunity reflects a rational accommodation between the imperatives of the privilege against self-incrimination and the legitimate requirements of prison disciplinary procedures."

Contrasted with *Simmons* and *Palmigiano* is the result reached in *McGautha*. Following the rationale of Simmons, the defendant Crampton in *McGautha* argued that the determination of guilt and punishment in the same proceeding forced him to make an unconstitutional choice between presenting evidence and testifying on the subject of leniency of the potential punishment against his privilege against self-incrimination concerning his guilt. Therefore, he requested that guilt and punishment could be accomplished constitutionally only in a bifurcated proceeding. The court concluded that not only was a bifurcated proceeding not mandated by constitutional considerations, but that an accused had no right to speak to the jury on the issue of leniency of sentence free from any adverse consequences related to the issue of guilt. In reaching a contrary conclusion as to whether an unconstitutional choice was involved on the particular facts before the court in McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), the Supreme Court in *McGautha* established a set of guidelines by which to decide if a defendant has been forced to make an impermissible choice between constitutional rights:

"The criminal process, like the rest of the legal system, is replete with situations requiring "the making of difficult judgments' as to which course to follow. McMann v. Richardson, 397 U.S. [759], at 769 [90 S.Ct. 1441, 25 L.Ed.2d 763]. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved."

Utilizing this newly announced procedure, the court proceeded to analyze the policies underlying the rights involved therein. Its analysis provides a useful device for comparison with the situation presently before the court. Central to its discussion of the Fifth Amendment rights involved is that use or waiver of Fifth Amendment rights in a single stage proceeding involves a normal tension unavoidably faced by attorneys and clients in every criminal trial. As the court points out, once an accused takes the stand he can never "claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. . . . It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by his prior convictions or the like. . . . Again it is not thought inconsistent with enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify." 402 U.S. at 215, 91 S.Ct. at 1471. The court thus concludes that waiver of the Fifth Amendment involves a natural tension built into a criminal trial and is, in those contexts, unavoidable. Further, the court found that the factual situation before it in *McGautha* did not differ in any legally significant manner from this normal situation. Consequently, this analysis weighed against declaring the choice faced by the defendant therein to be constitutionally impermissible.

However, the choice faced by the petitioner in the case at bar does differ significantly from the normal Fifth Amendment tension envisioned by *McGautha*. As an initial matter, the proceedings in question by their very nature must involve two hearings, as in *Simmons* and *Palmigiano*, rather than one as in *McGautha* and a typical criminal trial. Consequently, unlike *McGautha*, no extra burden on the State is

created by requiring a bifurcated procedure in order to avoid the potentially unconstitutional tension. Denying the State use of petitioner's testimony in the violation hearing at a subsequent criminal trial in no way interferes with the State's intended purpose, nor does it create any additional burden. The natural, unavoidable nature of the tension contemplated by the Fifth Amendment and *McGautha* disappears when what is involved are separate proceedings for separate purposes. Additionally, in a deferred sentence violation hearing, like a prison disciplinary hearing, the defendant possesses neither the benefit of strict rules of evidence and procedure, nor the benefit of a presumption of innocence unless proven guilty by the State beyond a reasonable doubt. Should the accused individual exercise his right to remain silent in the deferred sentence violation hearing, as petitioner did, unlike a criminal trial, he gives up his primary means of defense and greatly diminishes his chances for a successful outcome. The court in Palmigiano v. Baxter, *supra*, succinctly stated the dilemma faced by the accused:

> "Moreover, an exercise of the right to remain silent does not impose a significant burden upon the defendant in a normal criminal trial, because of such procedural safeguards as a strong presumption of innocence, a high burden of proof which the prosecution must overcome, and the full right to call witnesses and cross-examine adverse witnesses. Such safeguards, however, do not exist within the prison disciplinary hearing; if they did, the administrative burdens thereby entailed would be significant. Thus, an inmate's silence is likely to work against him in the disciplinary hearing, because in maintaining his silence he sacrifices his most important defense." 487 F.2d p. 1289.

This Court recognizes that Palmigiano was in a slightly different position from an individual at a deferred sentence violation hearing because he was actually informed that he would be affirmatively penalized for remaining silent. Yet, in most significant legal respects, the situations are very similar. The court found that the prison was governed by rules which required, *inter alia*, an opportunity to appear at the disciplinary hearing with the assistance of an authorized counsel-substitute, the right to call witnesses and cross-examine them, and the right to a decision based upon "substantial evidence." Most importantly, neither possesses the protection of the presumption of innocence or the high burden of proof upon the State. Accordingly, the court in *Palmigiano* noted:

> "If he keeps silent, his slience is almost bound to seriously cripple his defense within the disciplinary hearing. Silence is not a strategic alternative for him." N. 21.

Moreover, petitioner in this deferred sentence violation hearing faced the prospect of far greater sanction and loss of liberty than does a prisoner in a disciplinary hearing. While it is very difficult to accurately calculate and compare different degrees of loss of liberty, there can be no doubt that the twelve year sentence imposed upon petitioner represents a significantly more severe sanction than was at stake in Palmigiano v. Baxter and any comparison of the problem posed by each situation which ignored this factor would be at odds with fundamental notions of justice.

█ In any case, another critical distinction between the choice faced by the petitioner herein and the choice faced by petitioner Crampton in *McGautha* relates to the nature of and policies underlying the benefit counterbalancing the Fifth Amendment right in question. Recognizing the inability of the Fifth Amendment privilege asserted in *McGautha* to uphold petitioner's contentions by itself, the court in *McGautha* held:

> "The distinguishing feature in Simmons' case, we said, was that 'the "benefit" to be gained is that afforded by another provision of the Bill of

Rights.' Id., at 393–394 [of 390 U.S., 88 S.Ct. 967]. Thus the only real basis for holding that Fifth Amendment policies were involved was the colorable Fourth Amendment claim with which we had begun."

402 U.S. at 212, 91 S.Ct. at 1469. The counterbalancing benefit asserted in *McGautha* involved petitioner's opportunity to address the jury solely on the issue of punishment. However, the court expressly noted at p. 220, 91 S.Ct. 1454 that a defendant possesses no constitutional due process right to personally be heard on the issue of punishment and further finds that it is not even clear "whether and to what extent the concept of due process of law requires that a criminal defendant wishing to present evidence or argument presumably relevant to the issues involved in sentencing should be permitted to do so." 402 U.S. at 218, 91 S.Ct. at 1473. In fact, the right to address the jury on the issue of punishment has never attained constitutional dimensions. As the court wrote approvingly in Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1969):

> "We held in Williams v. New York, 337 U.S. 241 [69 S.Ct. 1079, 93 L.Ed. 1337], that the Due Process Clause of the Fourteenth Amendment did not require a judge to have hearings and to give a convicted person an opportunity to participate in those hearings when he came to determine the sentence to be imposed."

386 U.S. at 606, 87 S.Ct. at 1210. *Accord,* Hill v. United States, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); United States v. Picard, 464 F. 2d 215 (1st Cir. 1972). That being the case, the court in *McGautha,* consistent with its policy that the counterbalancing benefit to the Fifth Amendment privilege must be one afforded by the Bill of Rights to create a tension similar to that found impermissible in *Simmons supra,* held that no unconstitutional choice was forced upon petitioner Crampton.

Accordingly, before a proper comparison between *Simmons* and *Mc-Gautha* based upon the facts before this Court, the nature of and the policies underlying the counterbalancing benefit asserted by the petitioner must be analyzed. The specific questions raised are to what extent does constitutional due process apply in a deferred sentence violation hearing and is the right to testify personally and present evidence in a deferred sentence violation hearing one of constitutional dimensions? The Supreme Court of Rhode Island in Flint v. Howard, *supra,* held that no constitutional due process rights are involved. This Court respectfully must disagree.

In effect, a deferred sentence violation hearing involves two judicial actions. First, the court must determine that the individual is in violation of his probation. Then, the court determines his sentence or punishment. Three recent decisions create doubt as to the continued validity of that portion of Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 79 L. Ed. 1566 (1935) which held that no constitutional rights are involved in a probation revocation or a deferred sentence violation hearing. Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) declared that a deferred sentence violation hearing where a party faces sentencing is "a criminal proceeding . . . where substantial rights of an accused may be affected," 389 U.S. at 134, 88 S.Ct. at 256, and a lawyer must be afforded. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) subsequently held that although a parole revocation proceeding is a civil and not a criminal proceeding, the loss of liberty entailed is a serious deprivation requiring that at least minimal due process be afforded. Included in the minimum elements of due process required are the opportunity to be heard in person and to present witnesses and documentary evidence. Finally, in Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the court declared that due process required that the procedural rights enunciated in *Mor-*

*rissey* apply also in all probation revocation hearings. Clearly, no legally significant distinction exists between the probation revocation which was the subject of *Gagnon, supra,* and a deferred sentence violation hearing. While a defendant in a deferred sentence violation hearing does not possess the full panoply of criminal due process rights, minimum due process does require the procedures enunciated in *Morrissey* and *Gagnon.* Therefore, unlike the situation in *McGautha,* the benefit petitioner alleges as the counterbalance to the waiver of his Fifth Amendment right is protected by the Constitution.[1]

■ Confronted with primarily the same issue before the Court today but in the context of a parole revocation hearing, the United States Court of Appeals for the District of Columbia held in Melson v. Sard, 402 F.2d 653, 655 (1968):

"If a parolee is not given the full and free ability to testify in his own behalf and present his case against revocation, his right to a hearing before the Board would be meaningless. Furthermore, his Fifth Amendment rights must not be conditioned 'by the exaction of a price.' Accordingly, we hold that any self-incriminatory statements made in a parole revocation hearing shall not be used affirmatively against the parolee in any subsequent criminal proceeding."

Concomitantly, this Court feels that if the deferred sentence violation procedure is to be truly meaningful, the defendant must be able to freely testify on his own behalf and the exercise of this constitutional right may not be conditioned on the waiver of another constitutional right, his privilege against self-incrimination. In conclusion, no statement made by a defendant at a deferred sentence violation hearing may subsequently be used against him in a criminal trial. Finally, in order for this immunity to be of value, it is necessary that he be informed of its existence and its consequences prior to the hearing.

■ Nonetheless, the violation hearing need not be held in abeyance until the conclusion of the criminal trial on the new indictment. Adequate protection is provided a deferred sentence violator if the State is barred from affirmatively using any self-incriminating statements made in the violation hearing or any information derived therefrom in the subsequent criminal proceedings. Melson v. Sard, *supra*; Palmigiano v. Baxter, *supra*; Cf. Kastigar et al. v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); Sands v. Wainwright, 357 F.Supp. 1062 (M.D. Fla.1972); Carter v. McGinnis, 351 F. Supp. 787 (W.D.N.Y.1972). Petitioner's contention that his constitutional rights are jeopardized by holding the violation hearing prior to the criminal trial because of the undue discovery this proceeding affords the State has no merit. In Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) the Supreme Court rejected a contention based on a similar principle and upheld a Florida statute requiring a defendant to give the State prior to trial notice that he intended to rely upon an alibi defense and the substance of that defense. Similarly, the court in Melson v. Sard, *supra*, stated:

"We decline, however, to grant relief from appellant's second objection— that a pretrial hearing will force him to tip his hand in advance of trial and consequently reveal a portion of

---

1. Indeed, this conclusion is consistent with recent judicial concern for the increased role of due process safeguards whenever governmental decisions significantly affect individual interests regardless of the description of that interest as a right, privilege, liberty, or property. Palmigiano v. Baxter, *supra*; Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed. 2d 556 (1972); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed. 515 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1969); Sniadach v. Family Finance Corporation, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1967); Nolan v. Scafati, 430 F.2d 548 (1 Cir. 1970).

his defense strategy. Although appellant may necessarily have to divulge a part of his defense, this is offset by his ability to learn much of the Government's case against him. Certainly there is enough merit in the achievement of greater mutual pretrial discovery in criminal cases that we cannot condemn such a consequence as one which the court must resolutely forbid." 402 F.2d at 655.

■ This Court therefore concludes that petitioner was denied due process at his violation hearing in violation of the due process criterion established in *Simmons, supra,* and *Palmigiano, supra,* insofar as he was not provided with use immunity for statements he might have made in his defense. Moreover, the State has enunciated no reason sufficiently substantial to warrant this deprivation or limitation on constitutional rights. In spite of this, the State contends that the petition should be denied because the petitioner never took the stand at the hearing. It contends that he should have taken the stand at the violation hearing and at his subsequent criminal trial objected to the introduction of statements made at the violation hearing or evidence deduced therefrom. This concept ignores several substantial factors. First, before use immunity is of any value, the State must inform a party of its existence. Second, the very existence of the uncertainty of the admissibility of petitioner's violation hearing testimony at a future criminal trial forces a party to make an unconstitutional choice between constitutional rights thereby creating the untenable tension which is the very focus of this opinion and may seriously inhibit a party from taking the stand. As the court noted in Palmigiano v. Baxter, *supra,* at 1288 of 487 F.2d:

"Although under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966) and Mathis v. United States, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), any incriminating statements made within a custodial interrogation would presumably be suppressed at a subsequent criminal trial, the exclusionary rule provides scant protection where, as here, a defendant can never be wholly certain that his statements will be suppressed later on, especially since his actions may be interpreted as a voluntary waiver of such rights. Moreover, even if suppressed, defendants' statements within the disciplinary hearing may be useful to state prosecutors in planning and developing their prosecution.

Evidence derived from such testimony may be seriously damaging to the defendant; the mere prospect of its use is likely to seriously inhibit the defendant from making any statements whatsoever."

■ Under the circumstances, no need exists for the Court to address petitioner's final allegation challenging the standard of proof employed in deferred sentence violation hearings. Suffice it to say that this Court finds no support for the proposition that an individual cannot be declared to be in violation of his deferred sentence agreement unless the criminal standard requiring proof beyond a reasonable doubt is imposed. United States v. Chambers, 429 F.2d 410 (3d Cir. 1970); Seymore v. Beto, 383 F.2d 384 (5th Cir. 1967); United States v. Markovich, 348 F.2d 238 (2d Cir. 1965); United States v. Lauchii, 427 F. 2d 258 (7th Cir. 1970). While this Court today recognizes that minimal due process must be followed in this proceeding, the basic distinction between a violation hearing and a criminal trial is not obliterated. Petitioner has already been convicted of a crime prior to the commencement of the deferred sentence agreement and stands before the court in a very different position than a defendant stands before a criminal court prior to his conviction.

The application by the petitioner for a writ of habeas corpus is hereby granted, but execution is stayed pending the right of the State to appeal.

ADDENDUM TO OPINION DATED
DECEMBER 26, 1973

An order not yet having been entered in the above entitled matter, the following is added to and made a part of the Opinion for clarification purposes.

 The rule announced in this Opinion does not apply retroactively to deferred sentence violaters found in violation of their deferred sentence agreement prior to the rendition of this decision. The federal Constitution neither prohibits nor requires retrospective application of a judicial decision. Linkletter v. Walker, 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Rather the Court must weigh the merits in each case by looking to the peculiar traits and prior history of the rule in question. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Gosa v. Mayden, 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973); Robinson v. Neil, 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973). "Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice and the way in which these factors combine must inevitably vary with the dictate involved." Johnson v. New Jersey, supra, at 728 of 384 U.S., at 1778 of 86 S.Ct.

 As the court recently summarized in Stovall v. Denno, supra, at 297 of 388 U.S., at 1970 of 87 S.Ct.:

"The criteria guiding resolution of the question implicates (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

A last factor which is also relevant is whether the rule does or does not enhance the reliability of the fact-finding process at trial and if so, to what extent. Johnson v. New Jersey, supra; Tehan v. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L. Ed.2d 453 (1966); Gosa v. Mayden, supra.

While this Court clearly recognizes the significant effect of this decision on the reliability of the fact-finding process in deferred sentence violation hearings, it must also consider the potentially disruptive effect on the administration of justice retroactive application of this decision would cause. As the court in Stovall v. Denno, supra, noted in denying retroactive effect to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149, law enforcement officials have heretofore proceeded on the premise that the Constitution did not require the actions mandated herein and retrospective application would seriously disrupt the administration of the criminal law in Rhode Island. Furthermore, this Court feels that the purpose of the rule enunciated today will in no way be subverted by so limiting its application.