**Robert W. FLINT, Jr., Petitioner, Appellee,**

v.

**James MULLEN, Warden, etc., Respondent, Appellant.**

**No. 74–1061.**

United States Court of Appeals, First Circuit.

Argued May 9, 1974.

Decided June 25, 1974.

---

Donald P. Ryan, Asst. Atty. Gen., with whom Richard J. Israel, Atty. Gen., was on brief, for appellant.

Ralph J. Gonnella, Providence, R. I., with whom Hodosh, Spinella, Hodosh & Angelone, Providence, R. I., was on brief, for appellee.

Before COFFIN, Chief Judge, Mc-ENTEE and CAMPBELL, Circuit Judges.

PER CURIAM.

This is an appeal by the State of Rhode Island from a decision by the district court, 372 F.Supp. 213, which granted an application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on grounds that the petitioner was forced to make an unconstitutional choice between not taking the stand at his deferred sentence violation hearing, thereby sacrificing due process rights, or speaking up in his own defense and thereby risking self-incrimination in an upcoming criminal trial, based upon the same incident.[1]

Petitioner was on probation, pursuant to a deferred sentencing procedure authorized by Rhode Island General Laws (1956) [2] § 12–19–19, when he was arrested and indicted for bank robbery. Subsequent to the indictment, but prior

---

1. The state argues that petitioner's real concern was that he did not wish to disclose his defense, rather than that he feared self-incrimination. Yet however much he was motivated by a desire not to disclose exculpatory evidence, it seems reasonable to assume that anyone who testified in his violation hearing, preceding a criminal trial stemming from the same incident, would also run the risk of disclosing inculpating evidence, particularly when opening himself to cross-examination. We shall assume that both motives were present.

2. Petitioner had pleaded guilty five years before to three counts of robbery. He was

sentenced to prison on two of these. On the third, pursuant to the deferred sentence procedure, he was placed on probation for five years from the date of his release from prison on the first two counts. As a precondition to the benefits of the deferred sentence procedure, defendant had signed an agreement with the Attorney General that sentence might be deferred "during the good behavior of the defendant, and so long as the Attorney General is satisfied that the defendant had broken none of the criminal laws of this state since the date of this agreement."

to the criminal trial for robbery, the state moved to declare petitioner in violation of the deferred sentence agreement. Stressing that the deferred sentence violation hearing would compel him to reveal his defense prior to the criminal trial, petitioner thereupon moved *pro se* for leave to file writs of prohibition and mandamus in the Rhode Island Supreme Court, seeking to postpone the hearing until after trial. The motion was denied, Flint v. State, 106 R.I. 823, 259 A.2d 416 (1969), as was petitioner's application to us, Flint v. Rhode Island, No. 361 (Jan. 8, 1970).

A violation hearing was held before the Superior Court at which time the petitioner had the right to be heard personally, Harris v. Langlois, 98 R.I. 387, 202 A.2d 288 (1964), and the state had to present factual material proving that it was reasonable to believe Flint had failed to comply with the terms of his probation. Tillinghast v. Howard, 109 R.I. 497, 287 A.2d 749 (1972). Petitioner personally, as well as through his appointed counsel, again protested the holding of a revocation hearing before the trial. His motion for deferral was again denied. Petitioner's counsel then stated that there were facts favorable to the defense which should be presented at the hearing and that, in his opinion, the defendant should take the stand and testify. Calling five witnesses, all of whom were cross-examined by petitioner or by his counsel, the state presented evidence that defendant's brother, John, had robbed a bank and that defendant had participated by driving the getaway car in which he and his brother were arrested shortly after the robbery in the vicinity of the bank. Petitioner then informed the court that he and his counsel were in disagreement. Counsel was permitted to withdraw, and new counsel was appointed. At the close of the presentation of the state's evidence, the newly appointed counsel informed the court that petitioner chose neither to present evidence nor to take the stand because he did not wish to disclose his defense, planned for the upcoming trial. The Superior Court found petitioner in violation of his deferred sentence agreement and sentenced him to twelve years. The court emphasized that its finding was not just because an indictment was returned; it summarized the evidence and noted "we have given [defendant] the opportunity of being faced by his accusers." Petitioner was subsequently tried and acquitted on the robbery charge which had been at issue in the deferred sentence violation hearing.[3]

The district court concluded that petitioner was denied due process at his deferred sentence revocation hearing, in violation of the standards enunciated in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir. 1973), insofar as he was not provided with use immunity for statements he might have made in his defense. We believe, however, that the right not to speak embodied in the Fifth Amendment is not equivalent to a right to volunteer information to the government under a grant of immunity. In *Simmons, supra,* the Court determined that a rule which required a defendant to testify at a pretrial suppression hearing, in order to assert his Fourth Amendment claims, created an unconstitutional "tension" with defendant's Fifth Amendment privilege against self-incrimination, since "a defendant who knows that his testimony may be admissible against him at trial will sometimes be deterred from presenting the testimonial proof of standing necessary to assert a Fourth Amendment claim." *Id.* at 392. In *Palmigiano, supra,* the court held that when an inmate's silence is held against him, he

---

3. After the violation hearing, the brother pleaded guilty and was sentenced. Thereafter, at defendant's trial (at which defendant did not take the stand), the brother testified that defendant had taken no part in the crime. At the violation hearing, defendant's counsel had expressed interest in calling the brother but noted, doubtless correctly, that the brother would probably refuse to testify on grounds of self-incrimination.

must be provided "use" immunity for his testimony at a prison disciplinary hearing. We said that in those circumstances he faced "the constitutionally obnoxious dilemma of either remaining silent and risking greater punishment from the disciplinary board or speaking out in his own defense and risking self-incrimination in a subsequent criminal prosecution." *Id.* at 1288.

Neither *Simmons* nor *Palmigiano* is directly applicable to a deferred sentence violation hearing. Unlike the defendant in *Simmons,* petitioner was never faced with a choice between raising one constitutional right and foregoing another. The choice whether or not to exercise one's Fifth Amendment right to remain silent must often be made in a setting where there is a concomitant due process right to be heard. Petitioner's decision was, in effect, the same choice he or any other defendant must make when brought to trial. In *Simmons,* the penalty for remaining silent was waiver of a Fourth Amendment claim; in *Palmigiano* the inmate was specifically advised that his silence would be held against him. Here, however, the government had to prove its case by extrinsic evidence and there is no indication that defendant was penalized for silence except to the degree that anyone who claims the privilege may be said to forego the possibility of persuading a court in his favor.

In McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), which involved a defendant in a unitary trial faced with the difficult choice of speaking out for a lenient sentence and risking self-incrimination, or remaining silent and risking a harsh sentence, the Court held the choice did not unconstitutionally burden the defendant's Fifth Amendment right. The Court reasoned that "[t]he criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow . . . .," *id.* at 213, such as a defendant's decision whether to take the stand and risk strenuous cross-examination and proof of prior convictions. The defendant's difficult, but not unconstitutional, choice in *McGautha*'s unitary trial is essentially the same difficult, but not unconstitutional, choice faced by petitioner in the violation hearing. The possibility of a subsequent proceeding is not a critical difference.[4] A defendant at a criminal trial for a substantive offense may wish to speak in his own defense but refrain, fearing a subsequent conspiracy prosecution. The choice is a strategic one, within a setting which requires many strategic choices.

We would view the choice as less strategic were an adverse finding to be based on the fact of defendant's silence, rather than independent evidence, as here. In *Palmigiano, supra,* the defendant's silence in the prison disciplinary hearing could not be viewed merely as a strategic alternative, since he was advised that it would be held against him. Moreover, he had no right to appointed counsel, the role of retained counsel was limited, the right to call witnesses and cross-examine them was undermined by the possibility that the disciplinary board would rely upon informants, and the proceeding was conducted and the facts ultimately determined by correctional officials. Petitioner, however, was provided with counsel, and both petitioner and his counsel had full opportunity to cross-examine every adverse witness and could have called their own. O'Neill v. Sharkey, 107 R.I. 524, 268 A. 2d 720 (1970). The violation hearing was conducted before the State Superior Court. Although the burden of proof was less than that required in a criminal trial, Tillinghast v. Howard, *supra,* it was not so low that, as in *Palmigiano, supra,* a mere allegation of wrongdoing,

---

4. The timing of the hearing before the criminal trial may not be all to the accused's detriment. If the Court found that the accused did not commit the crime, that finding might well be *res judicata.* See 1B J. Moore, Federal Practice ¶ 0.418 [1], at 2702, n. 5 (2d ed. 1974).

unaccompanied by defendant's explanation or denial, would result in an adverse finding. In *McGautha, supra* at 213, the Court stated: "It is not contended, nor could it be successfully, that the mere force of evidence is compulsion of the sort forbidden by the privilege."

Petitioner urges upon us a broader analogy than *Palmigiano*, and likens his plight to that of the defendants in Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L. Ed.2d 574 (1967), where the Court held unconstitutional various penalties (disqualification from public bidding, removal from office, and disbarment) which attached to the valid exercise of the privilege against self-incrimination. Petitioner would have us view the risk of an adverse judgment in the violation hearing as a penalty upon petitioner's right to remain silent in his subsequent criminal trial, stemming from the same incident.

■ Yet not every undesirable consequence which may follow from the exercise of the privilege against self-incrimination can be characterized as a penalty. For example, it is unlikely that a state's refusal to issue a driver's license unless an applicant's name, address, and previous driving record were provided, would be viewed as a penalty upon the applicant's Fifth Amendment right not to divulge such information. *Cf.* Garner v. United States, 501 F.2d 228 (9th Cir., en banc, 1974). If the risk of an adverse judgment in the violation hearing were to be viewed as a penalty upon petitioner's right to remain silent in his subsequent criminal trial, stemming from the same incident, the same characterization would, no doubt, apply to the risk of an adverse judgment in any proceeding in which there is a recognized due process right to be heard and which is based on the same fact situation as a subsequent criminal trial. The result of such a broad rule might be to immunize whole classes of testimony from use in subsequent criminal trials, and place an unwarranted burden upon the state.

More importantly, the trilogy of Supreme Court employment cases on which petitioner relies all involved instances where the government was attempting to collect information for the express purpose of supplying evidence in subsequent criminal trials. *Lefkowitz, supra* at 81. Under these circumstances, the Court recognized that the Fifth Amendment privilege against self-incrimination was directly burdened by any penalty placed upon its exercise. Petitioner's violation hearing, however, was not conducted for the express purpose of gathering evidence for his subsequent criminal trial. On the contrary, its purpose was to give petitioner an opportunity to be heard. The suggestion in the dissent that Rhode Island may have used the violation proceeding to gather evidence is totally inapplicable to any of the present facts; and defendant's failure to testify at his criminal trial makes it speculative, at best, that the pendency of the latter proceeding somehow "coerced" him into silence.

■ To the extent that petitioner's argument is based upon what seems to be an unfair consequence of holding the violation hearing before the criminal trial—that petitioner could be convicted of violating his deferred sentence agreement, only to be acquitted, pursuant to a higher burden of proof, at his criminal trial—we sympathize.[5] In the ordinary

5. In fairness to the state, however, it should be recognized that there could be justifications for "violating" an individual though his guilt probably cannot be proven beyond a reasonable doubt at a criminal trial. For example, the government may have convincing evidence that a mobster took part in several serious crimes within the period of a deferred sentence, but, because certain witnesses fear testifying, may be in doubt whether it can secure a conviction under the higher proof and evidential standards obtaining in a criminal proceeding. Deferred sentencing and parole arrangements necessarily assume that the state retain sufficient effective control over one conditionally set at large to make such flexible sentencing a socially attractive and realistic alternative.

case, we see little public interest served by this kind of timing. Were the order reversed, the alleged violator could be held on high bail or without bail if he were a poor bail risk. If there were a criminal conviction, the subsequent violation decision would be simple; if there were an acquittal, the court conducting the violation hearing could proceed with full knowledge of that result, remaining free to weigh evidence by a lower standard, but having in mind the acquittal. The result is apt to be, if not also appear, more just.

This would be a different case if the penalty for violating the deferred sentence agreement—institution of the deferred sentence—were really a penalty for committing the very offense which had violated the agreement, since we would then have to consider whether the violation hearing met all the constitutional requirements for a criminal trial. The subsequent criminal trial, under these circumstances, might also raise problems of double jeopardy. But the record is silent on this point and it was not raised below. Petitioner was sentenced to twelve years in prison for violating his deferred sentence agreement. The agreement had been in lieu of a prison sentence for conviction on one count of robbery. Although the other two counts had resulted in a six year concurrent sentence, robbery carries a maximum penalty of life imprisonment, Rhode Island General Laws § 11–39–1 (1956; 1969 Reenactment).

Perhaps it would be preferable had the deferred sentence agreement stipulated the maximum sentence to be imposed if the agreement were violated, just as it would be preferable for the state to have held the violation hearing after the criminal trial. The Constitution, however, does not require the state, in every case, to adopt what appear to be preferable procedures. On the record before us, we are unable to find any basis for saying that the occasional unfairness which results from the state's ordering of the two proceedings, and convicting at the violation hearing while acquitting at the subsequent criminal trial, reaches unconstitutional proportions.

Reversed.

COFFIN, Chief Judge (dissenting).

As I read *Simmons, supra,* and the employment cases, *Lefkowitz, Garrity,* and *Spevack,* a principle emerges which, in my opinion, should control the instant case: the government should not be in a position where it might be tempted by potentially coercive means to short-cut its broad investigatory responsibilities and its obligation, if it wishes to punish an individual, to "produce the evidence against him by its own independent labors". Miranda v. Arizona, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966). Regardless of the government's good intentions in requiring a defendant to establish standing under the Fourth Amendment, or disqualifying contractors and removing officials from office who might be bribe-takers (and who have failed to offer information which might dispel that suspicion), these circumstances carry with them too much danger that government power to grant or deny rights and privileges will be used coercively. The safeguards which courts have created around the exercise of the Fifth Amendment's privilege against self-incrimination are essentially bulwarks against abuse of the government's coercive power.

In the instant case, the government's ability to time the violation hearing, with its lower burden of proof, so that it comes before the criminal trial on the same charge, enables the government to gain evidence for the criminal trial the easy way. The right to be heard personally in the deferred sentence violation proceeding—the right to explain one's "side of the story"—has been thought so important to an alleged violator that Rhode Island elevated it to a constitutional requirement a decade ago, Harris v. Langlois, 98 R.I. 387, 202 A.2d 288 (1964). Yet, with the government in control of the timing of the two proceedings, an alleged violator can explain his "side of the story" only by opening him-

self to self-incrimination in the subsequent criminal proceeding. Control over the timing of the two proceedings is as potentially coercive as control over removal from office or disqualification from public bidding. The fact that in this case the petitioner was subjected to a twelve year sentence for his violation while being later acquitted of the crime itself illustrates the temptations facing the government in being able to accomplish by a lower burden of proof what it would risk in a criminal trial. I see little inconvenience to the state: bail conditions or restrictions are available for the parolee awaiting trial; should the state wish to press ahead on a violation hearing in advance of trial, it could do so if it immunized the parolee for his testimony—all it would be sacrificing would be evidence which would normally be unavailable to it.

The pressures on the parolee, the latent possibility of manipulation of timing, and the minimal inconvenience placed on the state are such that I would affirm the opinion of the district court, with the proviso that the state be given the choice of providing use immunity or postponing the violation hearing until after the criminal trial.